

# NUMBER 13-24-00200-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RYANN ZELLER,                                                                   Appellant,

v.

GARY ALLEN, TOM OIL MONCRIEF,
AND GLORIA MONCRIEF HOLMSTEN
AS TRUSTEES OF THE 1966 TRUST
OF WILLIAM ALVIN MONCRIEF AND
ELIZABETH BRIGHT MONCRIEF,                                                      Appellees.

## ON APPEAL FROM THE 236TH DISTRICT COURT
## OF TARRANT COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca
Memorandum Opinion by Chief Justice Tijerina**

This case arises from appellant Ryann Zeller seeking to enforce her rights to her

alleged interest in a trust created in 1966 by William Alvin Moncrief and Elizabeth Bright

Moncrief. By two issues, Zeller argues the trial court erred by granting: (1) summary judgment in favor of appellees Gary Allen, Tom Oil Moncrief and Gloria Moncrief Holmsten as trustees of the 1966 Trust of William Alvin Moncrief and Elizabeth Bright Moncrief; and (2) appellees' motion for sanctions.[1] We affirm.

## I. BACKGROUND

In December 1966, William and Elizabeth created the trust, which provided that their son, William Alvin Moncrief, Jr. (Tex), would receive all net income from the trust during his lifetime. Upon Tex's death, the trust's corpus would be divided "into equal parts, one for each then living child" and "one part for the children and lineal descendants of each child who predeceased [Tex] leaving a surviving child or children or lineal descendants thereof." Thus, the trust's corpus would be distributed to Tex's lineal descendants per stirpes.

Tex had four sons, including Charles Moncrief. Charles died on January 6, 2021. Tex died eleven months later on December 29, 2021. Following Charles's death, his interest in the trust passed to his children, including Gloria. Gloria serves as co-trustee together with Tom, Charles's younger brother.

In 2021, a DNA sampling performed by Zeller revealed that Charles was her biological father, and Tex was her grandfather. On October 3, 2023, Zeller sued the co-trustees for breach of fiduciary duty, an accounting of the trust, and attorney's fees. Zeller sought a declaration that she is a beneficiary under the trust and is entitled to copies of all documents and communications regarding the trust, including "an accounting and

---

[1] This appeal was transferred from the Second Court of Appeals in Fort Worth pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001. We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

2

inventory" of the estate. As Charles's biological daughter, she claimed that she was "entitled to her portion of the 1966 Trust assets."

On November 9, 2023, Zeller served a subpoena on UT Southwestern Health Systems (Health Systems), subpoenaing "all tissue samples taken from" Charles that Health Systems retained as a result of previously treating Charles for an illness. The subpoena included a certificate of service indicating that the subpoena was electronically filed and served simultaneously upon appellees. However, appellees were not served until November 13, 2023, and the subpoena was not electronically filed.

On November 27, 2023, appellees filed a motion for summary judgment, asserting that Zeller was not a beneficiary of the trust and, accordingly, her contingent causes of action must fail. According to appellees, even assuming that Zeller is Charles's biological daughter, Zeller still "does not fall within the beneficiary class of 'children and lineal descendants' as that phrase is used in the trust" because in 1966, children "born out of wedlock" were not recognized as "children and lineal descendants." According to appellees, at the time the Moncriefs created the trust, a child born outside of the marriage was not considered a "child" or "descendant" under Texas law, and non-marital or "illegitimate" children did not fall within the legal meaning of children or lineal descendants.

On November 28, 2023, UT Southwestern Medical Center (Medical Center) informed Zeller that she served the wrong entity, and the correct entity to serve is Medical Center. Zeller thereafter released Health Systems from complying with her subpoena. On November 30, 2023, Zeller served a second subpoena and notice of deposition on Medical Center. The second subpoena included counsel's certification that appellees did

3

not object to the subpoena, that the time for appellees to object had passed, and that the subpoena complied with the Health Insurance Portability Accountability Act (HIPAA). Counsel further certified that the second subpoena was electronically filed and served on all counsel on November 30. However, this subpoena was not filed, and it was not served on appellees.

On December 4, 2023, appellees objected to the first subpoena served on Health Systems, stating that the tissue samples Zeller sought were protected under HIPAA, and they sought protection against its enforcement, claiming it invaded Charles's rights of privacy under the Texas and United States Constitutions. While appellees' objections to the subpoena served on Health Systems were pending, Medical Center provided written responses to Zeller regarding the second subpoena and provided Zeller with Charles's tissue samples.

On January 12, 2024, Zeller responded to appellees' motion for summary judgment, asserting that the plain and ordinary meaning of the language in the trust included non-marital children. According to Zeller, because the trust did not include limiting language or modify the terms "child or lineal descendant," the only reasonable interpretation is to include all the progeny or descendants of a person, irrespective of legitimacy. Zeller submitted her declaration, the subpoena duces from Medical Center, and the DNA testing results declaring her to be the biological child of Charles.

Appellees claim that on January 24, 2024, they received notice of the subpoena served on Medical Center. On January 31, 2024, appellees filed a motion for sanctions, requesting that Zeller return all tissue samples that belonged to Charles. The motion stated that Zeller's counsel falsely certified that the subpoena which was served on

4

Medical Center was served on appellees that same day. To support their motion, appellees attached the statement of assurance Zeller submitted to Medical Center, an e-mail string between Zeller's counsel and Health Systems and Medical Center, the deposition notice, and a declaration from Medical Center. Appellees further requested that the trial court exclude all DNA testing reports from evidence and prohibit disclosure of the same under any circumstances.

Zeller responded that even if the alleged conduct is true, "those facts do not amount to flagrant bad faith or callous disregard for the rules of discovery" such that sanctions would be appropriate.

The trial court held an evidentiary hearing on appellees' motions. On February 9, 2024, the trial court granted both motions. The trial court dismissed Zeller's claims with prejudice and ordered that Zeller immediately return all of Charles's medical samples. This appeal followed.

## II. SUMMARY JUDGMENT

By her first issue, Zeller argues that the trial court erred by granting summary judgment in favor of appellees.

## A. Standard of Review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.

5

*20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* TEX. R. CIV. P. 166a(b), (c). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to present competent controverting evidence that raises a fact issue. *Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

## B.    Applicable Law

"The construction of a trust instrument is a question of law for the court." *Episcopal Church v. Salazar*, 547 S.W.3d 353, 419 (Tex. App.—Fort Worth 2018), *aff'd in part, rev'd in part sub nom. Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417 (Tex. 2020). To determine whether Zeller is entitled to a share of the trust assets, we must look to the trust instrument itself and the law in effect at the time the trust became effective. *See Nail v. Thompson*, 806 S.W.2d 599, 600 (Tex. App.—Fort Worth 1991, no writ) (stating that to determine who should take under a testamentary trust, a court looks to the state of the law at the time the settlor died in conjunction with the language of the trust instrument); *In re Ray Ellison Grandchildren Tr.*, 261 S.W.3d 111, 118 (Tex. App.—San Antonio 2008, pet. denied) ("[I]n interpreting the trust, we look to the law as it existed at the time the trust was executed."); *see also Carpenter v. Carpenter*, No. 02-10-00243-CV, 2011 WL 5118802, at *3 (Tex. App.—Fort Worth Oct. 27, 2011, pet. denied) (mem. op.) (same). We interpret a trust in the same way we do a contract: "we ascertain the true intentions of the parties as expressed in the entire contract in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless." *Mabrey v.*

6

*SandStream, Inc.*, 124 S.W.3d 302, 314 (Tex. App.—Fort Worth 2003, no pet.); *Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied) (applying the same rule to the interpretation of a trust instrument). We ascertain the intent of the maker from the language within the four corners of the trust. *See Mabrey*, 124 S.W.3d at 314; *Eckels*, 111 S.W.3d at 694; *see also Carpenter*, 2011 WL 5118802, at *3.

## C.     Discussion

Zeller filed suit alleging breach of fiduciary duty and requesting an accounting of the trust. A claim for breach of fiduciary duty requires proof of the existence of a fiduciary duty, breach of the duty, causation, and damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). A beneficiary may request an accounting of the trust's transactions. *See* Tex. Prop. Code Ann. § 113.151. Thus, Zeller's causes of action are contingent on her being a beneficiary of the trust. *See Parker*, 514 S.W.3d at 220–21; *see also* Tex. Prop. Code Ann. § 113.151.

In their motion for summary judgment, appellees asserted that even if Zeller is Charles's biological child, she nevertheless "does not fall within the beneficiary class of 'children and lineal descendants' as that phrase is used" in the trust. The trust provides that upon the death of Tex, the trust estate shall be divided "into equal parts, one for each then living child" of Tex, and "one part for the children and lineal descendants of each child who predeceased [him] leaving a surviving child or children or lineal descendants thereof." The trust does not define the terms "children and lineal descendants"; therefore, we look to the law that was in effect at the time that the trust became effective—here December 22, 1966. *See Nail*, 806 S.W.2d at 600; *see also Wells Fargo, N.A. v. Clower*, No. 02-20-00058-CV, 2021 WL 4205056, at *13 (Tex. App.—Fort Worth Sept. 16, 2021,

7

no pet.) (mem. op.).

In 1966, the term "children" in the Probate Code did "not include an unrecognized, illegitimate child of the father." Act of Mar. 15, 1955, 54th Leg., R.S., ch. 55, sec. 3(b), 1955 Tex. Gen. Laws 88, 89 (former at TEX. PROB. CODE ANN. § 3(b)). The Probate Code further provided that "an illegitimate child" could not inherit from his father unless the father and the illegitimate child's mother "shall afterwards intermarry [then] . . . such child . . . shall . . . be legitimated and made capable of inheriting his estate." Act of Mar. 15, 1955, 54th Leg., R.S., ch. 55, sec. 42, 1955 Tex. Gen. Laws 88, 102 (former at TEX. PROB. CODE ANN. § 42). Courts routinely applied this definition to exclude non-marital children. *See Lane v. Phillips*, 6 S.W. 610, 611 (Tex. 1887) (stating while children born out of wedlock "are his children in fact, the rules of the common law refuse to recognize them as his children"); *Hayworth v. Williams*, 116 S.W. 43, 45 (Tex. 1909) (recognizing that "children and unmarried" only means "legitimate children of the deceased"); *Beaver v. State*, 256 S.W. 929 (Tex. Crim. App. 1923) (stating that when the word "child" or "children" is used in a statute, "it means a legitimate child or children only" and not to children of "illegitimate birth"); *James v. James*, 253 S.W. 1112, 1115 (Tex. App.—San Antonio 1923, writ ref'd) ("At common law an illegitimate child is incapable of inheriting from any source."); *Home of Holy Infancy v. Kaska*, 397 S.W.2d 208, 210 (Tex. 1965) ("We adhere, therefore, to the common law rule that a father has, by virtue of the blood relationship alone, no rights in his illegitimate child."); *Esparza v. Esparza*, 382 S.W.2d 162, 166 (Tex. App.—Corpus Christi–Edinburg 1964, no writ) (reviewing evidence of whether the children were illegitimate when born to determine whether they could later be made legitimate upon a subsequent marriage); *Bjorgo v. Bjorgo*, 391 S.W.2d 528, 530

8

(Tex. App.—Amarillo 1965) (noting that under the probate code, "'Child . . . '[u]nless expressly so stated herein, [child] does not include an unrecognized, illegitimate child of the father'"), *rev'd on other grounds*, 402 S.W.2d 143 (Tex. 1966); *Mills v. Edwards*, 665 S.W.2d 153, 155 (Tex. App.—Houston [1st Dist.] 1983, no writ) ("[S]ec[tion] 42(b) provides the only methods by which an illegitimate child may inherit from his father. If none of these methods are followed . . . then the illegitimate child is not eligible to inherit from his father.").

It is undisputed that Zeller was not a marital child of Charles. Because Texas law as it existed at the time did not recognize nonmarital children as descendants for inheritance purposes, we conclude that it was the Moncriefs' intent to only include marital children as beneficiaries. Consequently, the burden shifted to Zeller to raise a fact issue regarding the Moncriefs' intent. *See Peña*, 990 S.W.2d at 753.

Zeller recognizes that in 1966, "Texas law reflected a presumption that children born outside of wedlock were not afforded the same rights as children born during a marriage." Nonetheless, she argues that we adopt the changes to public policy and Texas law regarding children born out of wedlock. However, the law requires us to look to the Moncriefs' intent when they created the trust. *See Mabrey*, 124 S.W.3d at 314. In fact, according to the Supreme Court of Texas, "[i]t would be quite strange to ascertain th[e settlor's] intention by looking to the provisions of statutes enacted after the trust instruments became effective or considering changes in public policy as reflected thereby." *Cutrer v. Cutrer*, 345 S.W.2d 513, 519 (Tex. 1961). The fact that the law has subsequently changed has no bearing on determining the Moncrief's intent when they drafted the trust because we must "apply the law as it existed at the time the [trust] was

9

executed." *Parker v. Parker*, 131 S.W.3d 524, 531 (Tex. App.—Fort Worth 2004, pet. denied). Zeller provides us with no evidence that the Moncriefs' intended, contrary to the law in effect at the time the trust became effective, to include non-marital, illegitimate children as lineal descendants and beneficiaries of their trust. *See id.*; *see also Hagaman v. Morgan*, 886 S.W.2d 398, 400 (Tex. App.—Dallas 1994, writ denied) ("The law as it existed at the time a will was executed should be used in interpreting a will."). As a matter of law, Zeller is not a beneficiary of the trust. *See First United Pentecostal Church of Beaumont*, 514 S.W.3d at 220; *see also* TEX. PROP. CODE ANN. § 131.151. Therefore, the trial court did not err in granting summary judgment in appellees' favor. We overrule Zeller's first issue.

### III. SANCTIONS

By her second issue, Zeller argues the trial court abused its discretion in granting appellees' motion for sanctions because the "challenged conduct was not callous and did not amount to a flagrant disregard" of the discovery rules; appellees "failed to demonstrate any prejudice suffered as a result of the tissue samples being produced"; and the sanction "is not linked to the conduct [a]ppellees challenged."

### A. Standard of Review & Applicable Law

We review a trial court's imposition of discovery sanctions for an abuse of discretion. *Am. Flood Rsch. Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). We will reverse such a ruling only if the trial court acted "without reference to any guiding rules and principles," such that its ruling was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004); *see also Hawkins v. Myers*, No. 02-14-00123-CV, 2015 WL 1646812, at *9 (Tex. App.—Fort Worth Apr. 9, 2015, no pet.) (mem. op.).

10

When a trial court concludes that a party has abused the discovery process, the court is authorized to impose a sanction that is appropriate and just under the circumstances. *See* TEX. R. CIV. P. 215.3. Sanctions are appropriate and just if (1) there is a direct relationship between the sanctionable conduct and the sanction imposed and (2) less severe sanctions would not have been sufficient to promote compliance, i.e., the award was not excessive. *See Am. Flood*, 192 S.W.3d at 583; *TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding). "A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. It follows that a court must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance." *TransAm.*, 811 S.W.2d at 917.

Texas Rule of Civil Procedure 200.1 provides that "[a] notice of intent to take the deposition [on written questions] must be served on the witness and all parties at least 20 days before the deposition is taken." *See* TEX. R. CIV. P. 200.1(a). Under Rule 21a(e), the requesting party must also "certify to the court" that all parties have been served. *See id.* R. 21a(e).

## B. Sanctions Hearing

At the motion for sanctions hearing, Megan McKennon testified that she is an attorney representing Zeller, and she acted on Zeller's behalf regarding discovery in this case. On November 28, 2023, McKennon confirmed that she provided a certificate of service, certifying that she "caused a copy of this subpoena and notice of deposition to be served on all counsel of record and filed"; however, "[t]hat was not true." McKennon clarified to the trial court that the subpoena was actually "not filed at all" and not served

11

on appellees until November 13.

The following exchange transpired between McKennon and appellees' counsel:

| | |
|---|---|
| [Appellees:] | And you agree we're entitled to 20 days' notice of a deposition on written question under the Texas Rules of Civil Procedure? |
| [McKennon:] | I don't have the Rule in front of me, so I don't know if that's accurate. |
| [Appellees:] | Well, I think you do have it in front of you. Why don't we look at Tab 12, which is Rule 200 of the Texas Rules of Civil Procedure. |
| | . . . . |
| | Does that refresh your memory as to whether or not the deponent and the parties are entitled to 20 days' notice of a deposition on written question under our Rules? |
| [McKennon:] | It says, yes, that the notice of intent must be served on the witness and all parties at least 20 days before the deposition is taken. |
| [Appellees:] | And in this case 20 days would have run after the date of service on us, opposing counsel, on the 3rd of December. You take the 13th of November, add 20 days, but that was on a Sunday. So the actual . . . date by which our side could file objections was the 4th of December, correct? |
| [McKennon:] | I don't agree with that. But 20 days after that date is December the 3rd. |
| [Appellees:] | Okay. Well, let's make sure we understand each other. You don't disagree that we were entitled to 20 days' notice, correct? |
| [McKennon:] | I just read the Rule. I think that the— |
| THE COURT: | Counsel, that was a yes or no question. |
| [Appellees:] | Twenty days. We're entitled to 20 days. |
| [McKennon:] | Yes. |

| | |
|---|---|
| [Appellees:] | Okay. Twenty days ran on December 4th, right? |
| [McKennon:] | Twenty days is the 3rd, but the next day is a Monday, the 4th. |
| [Appellees:] | So the 4th would have been the last date for us to be able to file objections under the Rules, correct? |
| [McKennon:] | I don't agree. But, yes, that is 20 days from when [appellees'] received notice. |
| [Appellees:] | Okay. Now, you're taking the position that even though it's shorter than 20 days, that our side had to answer on 17 days' notice, correct? |
| [McKennon:] | I didn't catch the first part of your question. |
| [Appellee:] | Okay. You're taking the position that even though opposing counsel is entitled to 20 days' notice of a deposition on written question, that our last date to object wasn't 20 days, it was 17 days later after notice to us, correct? |
| [McKennon:] | I understand what the Rule says, but based on the wording of the subpoena, 20 days is from service of the date that the . . . the nonparty is served. |
| [Appellee:] | You're not really trying to argue that if you give the deponent 20 days, that you don't have to give opposing counsel the same 20 days, are you? |
| [McKennon:] | This is my—how I read the Rule. |

McKennon acknowledged that when she served a second subpoena on Medical Center, she signed another certificate of service, certifying that she filed and served the second subpoena on all counsel. McKennon admitted that, like the first subpoena, the second subpoena "was inadvertently not served or filed." Furthermore, in the statement of assurances as required by HIPAA, McKennon assured Medical Center that, "[n]o objection was filed by [appellees] in response to the subpoena." McKennon further

13

represented to Medical Center that under HIPAA, "[t]he time for the individual to raise objections to the court or administrative tribunal has elapsed." According to McKennon, she filed these statements because "[a]t the time that [she] signed this, [she] thought that the deadline had pas[sed]."

Four days later, on December 4, appellees filed objections to the first subpoena and deposition notice to Health Systems. McKennon testified that on December 13, Medical Center provided Zeller with the written deposition and the tissue samples.

When appellees contacted Medical Center informing them that McKennon failed to notify them of the subpoena, Medical Center immediately notified McKennon by letter, which was submitted into evidence. In the letter, Medical Center requested that Zeller return the tissue samples and destroy all its responsive information or alternatively asked for proof that the statement of assurances McKennon provided was true and correct. The letter stated:

> [The] Statement of Assurances [you] provided on November 30 was inaccurate. You knew that you had withdrawn the subpoena [to] "UT Southwestern Health Systems" and issued a new subpoena [to]" UT Southwestern Medical Center," but you apparently did not serve counsel for Defendants. As of December 4, 2023, you knew that Defendants objected to the production of the responsive material. Yet from December 4 through December 13, 2023, you did not notify UT Southwestern. You knew UT Southwestern was relying on your Statement of Assurances, which you also knew was no longer accurate. These omissions are inexcusable. [Further,] you emailed me and other UT Southwestern employees multiple times between December 4 and December 13, but you never disclosed a motion for protective order had been filed . . . . I find your actions shockingly dishonest, unethical, and unprofessional. UT Southwestern relied on the November 30 Statement of Assurances to its detriment and will fully enforce the indemnification and hold harmless provision against [you]. The responsive information is protected health information under HIPAA.

The letter concluded that Medical Center felt "confident the Texas State Bar

14

Professionalism and Ethics Committee would agree."

In response, McKennon replied that Zeller followed HIPAA, she offered to return the tissue samples back to Medical Center but did not offer to destroy the test results.

At the conclusion of the hearing, the trial court explained:

It's very interesting to the Court that these so-called mistakes—all the result[s] of the so-called mistakes all followed the same pattern. These weren't mistakes that some of them benefitted the [appellees], some benefit [Zeller] and so forth. There is a consistency here that is hard to ignore, and they are all consistent with bad faith, all of them. I can't find an exception. If you can find an exception, please tell me . . . .

[I]f counsel was trying to rush this so they could—so you could get what you wanted, you would have done everything you did, it seems to me, and I'm very bothered by it. I'm very bothered by the explanations that I heard from your witness . . . . I'm sorry. And one of the things that just leaps out to me was the HIPAA requirements that weren't followed . . . . I was following what [appellees] said was part of the statute and what was required to be given, and it was deliberately omitted, it seems to me. And it's not only the Rules, it's the lawyer's creed. I remember when that came out, and I was thinking, why do they need to do that? I mean, we all learned this stuff in professional responsibility, or if we didn't, it's just common sense . . . .

Clearly your firm knew who was on the other side. I didn't hear any discussion or testimony of any phone calls or discussions between counsel, which we say with pride is the Tarrant County way, but, unfortunately, it doesn't encompass the whole county . . . . But I didn't hear once that there was any call to opposing counsel and here's what we need to do, and it's hard to escape the fact there wasn't a reason why. And, also, if this were simply a document or something like that, it might be different, but the fact it's brain tissue of a family member is hard to ignore . . . . I'm just talking about the fact, for God['s] sake, it's brain tissue of a deceased member of their family.

The trial court granted the motion requesting sanctions, stating it "could not [believe] that this was just a series of mistakes. And [Zeller's] counsel is lucky that [appellees] didn't seek stronger sanctions." The court ordered that Zeller return all tissue samples and prohibited any use of the samples.

15

## C.     Discussion

Here, the record reflects the trial court had ample evidence to support its finding that McKennon abused the discovery process. *See* TEX. R. CIV. P. 215.3. There was evidence that: (1) McKennon did not comply with Rule 200.1(a) requiring notice of deposition to be served on all parties at least twenty days in advance; (2) McKennon did not comply with Rule 21a(e) requiring that she certify to the court all parties have been served; (3) McKennon did not file the first subpoena and notice of deposition with the trial court; (4) McKennon did not serve appellees with the first subpoena and notice of deposition and stated this was "inadvertent"; (5) McKennon again falsely certified that she complied with Rule 21a(e) as to the second subpoena and notice of deposition when she did not; (6) McKennon stated that the aforementioned was not done due to a complete "oversight"; (7) McKennon falsely assured Medical Center that she provided appellees with the subpoena and deposition and that appellees had no objection; (8) McKennon falsely advised Medical Center that the time for appellees to object to the subpoena and deposition had passed; (9) McKennon did not inform Medical Center of appellees' objections to the first subpoena even though they were on file in the trial court; and (10) McKennon's responses on the witness stand were evasive, such that the trial court was "very concerned" about McKennon "not answering the questions."

Our review reveals that McKennon did not comply with the Texas Rules of Civil Procedure regarding notice on several occasions. *See* TEX. R. CIV. P. 200.1(a); *see also* R. 21a(e). McKennon simply attributes these "missteps" due to "inadvertences" and "an oversight in the office." *See Cire*, 134 S.W.3d at 839 (providing that sanctions are used to assure compliance with discovery and to deter those who might be tempted to abuse

16

discovery in the absence of a deterrent). But the trial court was within its discretion to disbelieve these explanations. *See Fuentes v. Zaragoza*, 555 S.W.3d 141, 175 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("At a sanctions hearing, the trial court is entitled to judge the credibility of the witnesses and the weight of their testimony, because it has the opportunity to observe their demeanor."). Furthermore, there is a direct relationship between the improper conduct in seeking the tissue samples and the sanction imposed. The trial court's order prohibiting the use of the samples was directly related to McKennon's repeated discovery violations in obtaining the samples and without affording appellees the chance to object. *See Am. Flood*, 192 S.W.3d at 583. Moreover, this sanction was not excessive because the record reflects that McKennon had no cogent explanation for her violations, did not contact opposing counsel, and averred under HIPAA that opposing counsel acquiesced to the subpoena and deposition. *See id.*; *see also Myers v. Branch Banking & Tr. Co.*, No. 02-19-00080-CV, 2020 WL 1646751, at *7 (Tex. App.—Fort Worth Apr. 2, 2020, no pet.) (mem. op.) ("The record reflects that Myers did absolutely nothing to determine what discovery [was] actually served . . . or to determine whether [opposing counsel] had filed any subpoenas with the court . . . . He did not call the court. He did not check the online docket. He did not contact [opposing] counsel."). In this regard, the trial court stated that McKennon acted flagrantly because she needed to rush the tissue samples to ascertain the results of the DNA quickly. *See Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied) ("Improper motive is an essential element of bad faith.").

Zeller argues that these sanctions must be considered "death penalty sanctions," which cannot be imposed "absent a party's flagrant bad faith or counsel's callous

disregard for the responsibilities of discovery under the rules." Under Texas law, death penalty sanctions "terminate the presentation of the merits of a party's claims." *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 845 (Tex. 1992). Here, Zeller's case is not dependent on this evidence because as previously explained, even if Zeller can prove she is Charles's biological daughter, she still is not a beneficiary of his trust as a matter of law. *See* Act of Mar. 15, 1955, 54th Leg., R.S., ch. 55, sec. 3(b), 1955 Tex. Gen. Laws 88, 89 (former at TEX. PROB. CODE ANN. § 3(b)). Therefore, exclusion of this evidence does not preclude the presentation of the merits of Zeller's claim.

Accordingly, the trial court, after serving notice and holding a hearing where McKennon provided a dubious explanation for her improper actions, had the discretion to impose an appropriate sanction authorized by Rule 215.3. *See* TEX. R. CIV. P. 215.3. Because the trial court acted in accordance with the guiding Rules of Civil Procedure in finding that McKennon abused the discovery process, we find that it did not abuse its discretion in requiring Zeller to return the tissue samples, excluding the same from evidence, and barring Zeller from using them for any purpose. *See Am. Flood*, 192 S.W.3d at 584; *see also Buttler v. Sutcliffe*, No. 02-15-00319-CV, 2016 WL 4491224, at *5 (Tex. App.—Fort Worth Aug. 26, 2016, no pet.) (mem. op.) (finding the trial court did not abuse its discretion in awarding sanctions given appellant's initial lack of cooperation in scheduling a deposition, her knowledge there would be no translator, her decision to wait until the day before the deposition to file a motion for a protective order that requested a translator, her decision to appear at the deposition without a translator, and her decision to leave the deposition without obtaining a ruling on her motion for a protective order). We overrule Zeller's second issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
20th day of November, 2025.